

DEC 30 2025 AM 11:01
FILED - USDC - NDTX - AM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| BENIGNO PAEZ, | § | |
| | § | |
| Movant, | § | |
| | § | |
| v. | § | Crim No. 2:17-cr-00043-D-BR-2 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent. | § | |

## MOTION FOR COMPASSIONATE RELEASE
## PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND
## THE FIRST STEP ACT OF 2018

COMES Movant, BENIGNO PAEZ ("Paez"), appearing *pro se,* and in support

of this memorandum would show as follows:

### I. STATEMENT OF JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is

limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582.

The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is

extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is

black-letter law that a federal court generally "may not modify a term of imprisonment

once it has been imposed." *Id.* However, Congress has allowed an exception to that

rule "in the case of a defendant who has been sentenced to a term of imprisonment

1

based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. STATEMENT OF THE CASE

### A.    Procedural Background

On August 7, 2017, the United States Attorney in the United States District Court for the Northern District of Texas, Amarillo Division, returned a two (2) count Superseding Information charging Paez. See Doc. 95.[1] Count 1s charged Paez with Possession with Intent to Distribute A Mixture and Substance Containing A Detectable Amount of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). *Id.* Count 2s charged Paez with Possession of A Firearm in Furtherance of A Drug Trafficking Crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and (c)(1)(A)(i). *Id.*

On August 16, 2017, an Arraignment Hearing was held and Paez pled guilty to Count 1s and 2s of the Superseding Information, pursuant to a written Plea Agreement. See Docs. 92, 99.

On November 29, 2017, Paez was sentenced to a total term of 248 months'

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the Northern District of Texas, Amarillo Division in Criminal No. 2:17-cr-00043-D-BR-2, which is immediately followed by the Docket Entry Number.

imprisonment, 3 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $200. See Docs. 133, 142.

On September 23, 2019, Paez filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"). See Doc. 183.

On August 6, 2024, Paez filed a Motion to Reduce Sentence re: 821 Amendment, which was denied on November 24, 2024. See Docs. 190, 191, 197.

On March 16, 2020, the Court filed a Order adopting Findings, Conclusions and Recommendation, Granting Respondent's Motion to Dismiss, and Dismissing Paez's § 2255 Motion and denied him a Certificate of Appealability. See CvDocs. 11, 12, 13.[2]

On July 17, 2020, Paez filed a Notice of Appeal re: Denial of § 2255 Motion, which was dismissed by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") on September 29, 2020. See CvDocs. 14, 16.

**B.    Statement of the Facts**

1.    Offense Conduct

The United States and Paez, through the advise of his counsel, agreed and stipulated to the following Factual Resume:

---

[2]    "CvDoc." refers to the Docket Report in the United States District Court for the Northern District of Texas, Amarillo Division in Criminal No. 2:19-cv-00185-Z-BR, which is immediately followed by the Docket Entry Number.

On April 30, 2017, Drug Enforcement Administration (DEA) Task Force Officer (TFO) Vern Wilson, working in an undercover capacity, made phone contact with a subject known as "Chicago," who was known to sell large quantities of methamphetamine and cocaine in Amarillo, Texas. DEA agents later learned that "Chicago" was Eliazar Rocha. Through text communications, TFO Wilson and Rocha agreed to meet in the parking lot of the Burlington Coat Factory located at 2201 S. Western, Amarillo, Texas.

Rocha sent a text message to TFO Wilson that he was getting "it" ready and it would be approximately two hours. Agents believed "it" was referring to methamphetamine. Approximately two hours later, Rocha arrived at the meet location at the Burlington Coat Factory with a passenger in his car, later identified as Andres Hernandez Jr. Rocha exited his vehicle and met with TFO Wilson and TFO Ponce. Rocha agreed to go get six pounds of methamphetamine for TFO Wilson and TFO Ponce for the agreed price of $5,500 per pound.

At approximately 5:47 p.m. Rocha and TFO Wilson agreed to meet at Home Depot located at 2410 S. Georgia, Amarillo, Texas, to conduct the drug transaction. Rocha arrived at the meet location in a Chevrolet Malibu with three other individuals. The driver of the vehicle was later identified as Benigno Paez. The front passenger was later identified as Andres Hernandez Jr., and the back passenger with Rocha was later identified as Arnulfo Sauceda.

Rocha exited the Chevrolet Malibu carrying a large brown box and got in the undercover vehicle. Rocha showed TFO Wilson and TFO Ponce the suspected methamphetamine that was located inside the box. Based on the TFO Wilson's training and experience, he believed the crystal like substance was methamphetamine. Paez admits that he knowingly possessed this suspected methamphetamine.

TFO Wilson and TFO Ponce told Rocha that they did not have the money on them. Rocha then exited the vehicle with the box containing the methamphetamine. Rocha got back inside the Chevrolet Malibu.

An arrest team moved in and arrested all four subjects inside the vehicle, including Rocha. Agents searched the vehicle and located the brown box with the suspected methamphetamine. Agents also located a firearm, to wit: a stainless Colt Commander, .45 ACP, serial number CJ46658, in the glove box. Agents later learned the firearm was stolen. Paez admits he knowingly possessed this firearm.

Agents read Rocha his *Miranda* warnings, and Rocha agreed to be interviewed. Rocha told DEA agents that the methamphetamine came from a residence located at 1317 North Cleveland, Amarillo, Texas, which was corroborated during surveillance conducted on April 30, 2017.

A search warrant was obtained and executed at the residence located on 1317 N. Cleveland, Amarillo, Texas. Agents learned that Sauceda was currently residing at the residence. During a search of the residence, agents located approximately four pounds of suspected methamphetamine in a plastic container in the bathroom. Agents also located Igloo containers with suspected liquid methamphetamine being converted to a finished solid product. Agents collected samples of the liquid methamphetamine.

The methamphetamine was sent to the DEA South Central Laboratory. On June 27, 2017, the DEA South Central Laboratory confirmed that the substance was in fact methamphetamine, a Schedule II controlled substance. The methamphetamine the agents seized from the vehicle had a net weight of 2,622 grams with a purity level of 95 percent. The methamphetamine the agents seized at 1317 N. Cleveland during the search warrant had a net weight of 1,846 grams with a purity level of 97 percent. The samples from the Igloos also were confirmed to contain methamphetamine. This quantity of methamphetamine indicates that it was intended for further distribution and not Paez's personal use.

Paez admits that the firearm described in this factual resume furthered, advanced, or helped forward his possession with intent to distribute methamphetamine. That is, the firearm furthered the drug trafficking crime by providing protection for Paez and his co-conspirators during the drug transaction with TFO Wilson and TFO Ponce.

5

See 91 at 3-5.

### 2.    Plea Proceeding

On August 16, 2017, an Arraignment Hearing was held before Judge Sidney A Fitzwater. See Doc. 99. Paez pled guilty to Counts 1s and 2s of the Superseding Information, pursuant to a written Plea Agreement. See Doc. 92. In exchange for Paez's guilty plea, (a) the government agreed not to bring any additional charges against Paez based upon the conduct underlying and related to his plea of guilty, and (b) the government agrees to move to dismiss the remaining counts of the indictment as to the defendant. *Id.*

### 3.    Sentencing Proceeding

On November 29, 2017, a Sentencing Hearing was held before Judge Sidney A Fitzwater. See Doc. 133. At sentencing, the District Court sentenced Paez to 188 months as to Count 1s, 60 months as to Count 2s, to run consecutively, for a total term of 248 months' imprisonment;  followed by 3 years of supervised release. See Doc. 142. The Court also ordered payment of aa  Mandatory Special Assessment Fee of $200. *Id*. No direct appeal was filed in this case.

### 4.    Postconviction Proceeding

On September 16, 2019, Paez submitted handwritten correspondence to this Court asserting he was denied effective assistance of counsel in his criminal proceeding

6

because counsel "never asked" him if he wanted to appeal his sentence. See Doc. 183. The Court construed Paez's correspondence as an attempt to initiate a § 2255 Motion, and docketed his motion under a new civil cause number. *Paez v. United States*, No. 2:19-CV-185. See CvDoc. 2. On November 15, 2019, per this Court's instructions, Paez filed an amended motion to vacate on the form required by federal courts in the Northern District of Texas. See CvDoc. 6. On December 27, 2019, the government filed a motion to dismiss Paez's 2255 Motion as untimely. See CvDoc. 10. Paez did not file a response in opposition to the motion to dismiss.

Paez asserted he was denied his constitutional right to effective assistance of counsel in his underlying criminal proceeding because trial counsel failed to file a notice of appeal challenging pPaez's conviction and sentence despite his request, at the November 29, 2017 sentencing, that he do so.

On March 16, 2020, this Court dismissed Paez's 2255 Motion as time barred by the statute of limitations. See CvDoc. 13.

## III. <u>DISCUSSION</u>

As a preliminary matter, respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. See *Hernandez v. Thaler*, 630 F.3d 420 (5th Cir. 2011); *Estelle v. Gamble*, 429 U.S. 97 (1976) (same); and *Haines*

7

*v. Kerner*, 404 U.S. 519 (1972) (same).

### A.   Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Paez's sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

### 1.   Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. §3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the

8

statute was intended, in part, to abolish and replace federal parole. Rather than have the

parole board review for rehabilitation only, Congress authorized review for changed

circumstances:

> The Committee believes that there may be unusual cases in which an
> eventual reduction in the length of a term of imprisonment is justified by
> changed circumstances. These would include cases of severe illness,
> cases in which other extraordinary and compelling circumstances justify
> a reduction of an unusually long sentence, and some cases in which the
> sentencing guidelines for the offense of which the defender was convicted
> have been later amended to provide a shorter term on imprisonment. S.
> Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences"

that would previously have been addressed through the former parole system. *Id*. at

121. The provision was intended "to assure the availability of specific review and

reduction of a term of imprisonment for "extraordinary and compelling reasons" and

[would allow courts] to respond to changes in the guidelines." *Id*. Thus, sentencing

courts have the power to modify sentences for extraordinary and compelling reasons.

### 2.    Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes

"extraordinary and compelling reasons" to the United States Sentencing Commission.

28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered

"extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

Pursuant to section 994(p) of title 28, United States Code, the United States Sentencing Commission hereby submits to the Congress the following amendments to the Guidelines Manual and the reasons therefor. As authorized by such section, the Commission specifies an effective date of November 1, 2023, for these amendments:

    (b)   *Extraordinary and Compelling Reasons.–* Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

        (1)   *Medical Circumstance of the Defendant.–*

            (A)   The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.

            (B)   The defendant is—

                (i)   suffering from a serious physical or medical condition,

                (ii)   suffering from a serious functional or cognitive impairment, or

                (iii)   experiencing deteriorating physical or mental

health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C)    The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

(D)    The defendant presents the following circumstances—

(i)    the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii)    due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii)    such risk cannot be adequately mitigated in a timely manner.

(2)    *Age of the Defendant.*— The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(3)    *Family Circumstances of the Defendant.*—

11

(A)    The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

(B)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(C)    The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

(D)    The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

(4)    *Victim of Abuse.*— The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:

(A)    sexual abuse involving a 'sexual act,' as defined in 18 U.S.C. § 2246(2) (including the conduct described in 18 U.S.C. § 2246(2)(D) regardless of the age of the victim); or

(B)    physical abuse resulting in 'serious bodily injury,' as

12

defined in the Commentary to §1B1.1 (Application Instructions); that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant. For purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

(5)   *Other Reasons.*— The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

(6)   *Unusually Long Sentence.*— If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

This amendment responds to, among other things, the First Step Act of 2018 ("First Step Act"), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239, which amended 18 U.S.C. § 3582(c)(1)(A) to authorize courts to grant a motion for a sentence reduction upon a defendant's own motion. Previously, a court was authorized to do so

only upon the motion of the Director of the Bureau of Prisons ("BOP"). Congress amended the law for the express purpose, set forth on the face of the enactment, of "increasing the use" of sentence reduction motions under section 3582(c)(1)(A). First Step Act § 603(b).

### 3.   The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id*. at § 603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file an appropriate motion if the he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. §3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the

14

First Step Act includes "a number of very positive changes, such as … improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

4.    Paez Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

Paez has filed a request for compassionate release to the Warden at FCI Bastrop, but he has not received a response yet. Because 30 days have lapsed from the receipt of the request and the BOP failed to file a motion on Paez's behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

**B.    The Changes in Relevant Law, along with Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct, Are Extraordinary and Compelling Circumstances That Warrant Release.**

15

Section 3582(c) states that a district court cannot modify a term of imprisonment

once it has been imposed except that, in any case:

> The court, upon motion of the Director of the Bureau of Prisons, or upon
> motion of the defendant after the defendant has fully exhausted all
> administrative rights to appeal a failure of the Bureau of Prisons to bring
> a motion on the defendant's behalf or the lapse of 30 days from the
> receipt of such a request by the warden of the defendant's facility,
> whichever is earlier, may reduce the term of imprisonment (and may
> impose a term of probation or supervised release with or without
> conditions that does not exceed the unserved portion of the original term
> of imprisonment), after considering the factors set forth in section 3553(a)
> to the extent that they are applicable, if it finds that—
>
> > (i)    extraordinary and compelling reasons warrant such a
> > reduction.

18 U.S.C. § 3582(c)(1)(A).

In this case, there are at least five extraordinary and compelling reasons

warranting such a reduction, discussed as follows:

1.    Drug Weight Calculation

Here, Paez urges the Court to assess *United States v. Stanback*, 377 F. Supp. 3d

618 (W.D. Va. 2019). In *Stanback*, Kelly George Stanback, represented by counsel,

filed a motion to reduce his sentence pursuant to Section 404(b) of the First Step Act

of 2018. ECF No. 1449. He asks the court to reduce his current sentence of 622 months

to time served. The government asserts that Stanback is ineligible for consideration of

a reduction in his sentence, and in the alternative, that if he is eligible for consideration,

a further reduction of his sentence is not warranted. The government suggests that the only relief to which Stanback is entitled is a reduction in his term of supervised release from 5 years to 4 years. For the reasons set forth below, the court granted Stanback's request and modified his sentence to time served, to be followed by a 4-year term of supervised release.

The drug weight is an element of the offense and that any fact that increases a mandatory minimum penalty is an element that must be charged in an indictment and proved to a jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). Under those two cases, if Stanback were sentenced today, his sentence would be based on distributing 5 grams or more of cocaine base, and not 3,000 kg to 10,000 kg of Marijuana equivalent.

In *Apprendi*, the Supreme Court held that the Sixth Amendment to the Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. In *Alleyne*, the Court applied *Apprendi* to the federal mandatory minimum and maximum sentencing scheme and held that because mandatory minimum sentences increase the penalty for a crime, any fact that increases the mandatory minimum is an element of the crime that must be

17

submitted to the jury. *Id.* at 116, 133 S.Ct. 2151 (overruling *Harris v. United States*,

536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) ).

Neither *Apprendi* nor *Alleyne* are retroactively applicable on collateral review.

See *United States v. Sanders*, 247 F.3d 139, 146 (4th Cir. 2001) (joining other circuits

in finding that *Apprendi* does not apply retroactively to cases on collateral review); and

*United States v. Stewart*, 540 Fed.Appx. 171 (4th Cir. 2013) (*per curiam*) (noting that

*Alleyne* has not been made retroactively applicable to cases on collateral review).

However, for a period of time after *Apprendi* was decided, including before passage

of the Fair Sentencing Act in 2010, the jury ordinarily made a finding regarding the

threshold penalty, but the court could and did impose statutory-minimum penalties

regardless of any jury finding. That practice was authorized by *Harris*, and *Alleyne* did

not overrule *Harris* until three years later, and three years after the Fair Sentencing Act

was enacted. Nonetheless, Congress, when drafting the First Step Act in 2018, surely

did not intend for courts to disregard the last six years of Supreme Court federal

sentencing jurisprudence and this court declines to do so.

*Alleyne* made clear that in order to preserve a defendant's Sixth Amendment

right to a jury trial, any fact that increases the statutory mandatory minimum sentence

is an element of the crime which must be submitted to the jury. *Alleyne*, 570 U.S. at

116, 133 S.Ct. 2151. Under *Alleyne*, this court is not free to ignore that finding and

impose a penalty based on the 4.4 kilograms of actual methamphetamine (actual) as referenced in the PSR. Thus, although *Apprendi* and *Alleyne* are not retroactively applicable on collateral review, this court joins other courts in finding that their holdings are applicable in the context of the First Step Act. See *United States v. Simons*, No. 07-CR-00874, 375 F.Supp.3d 379, 487, 2019 WL 1760840 at *6 (E.D.N.Y. Apr. 22, 2019) (citing *Alleyne* and finding that statutory penalties are determined by facts submitted to a grand jury, trial jury, or established by a guilty plea while findings by a judge may be used to determine a sentence within the statutory penalties and cannot change "the mandatory minimum sentence now applicable"); *United States v. Dodd*, No. 3:03-CR-18-3, 372 F.Supp.3d 795, 2019 WL 1529516 (S.D. Iowa, Apr. 9, 2019) (finding in a First Step Act case that "[b]oth *Apprendi* and *Alleyne* are binding on this Court for sentencings held today."); *United States v. Davis*, No. 07-CR-245(S)(1), 2019 WL 1054554 (W.D.N.Y. Mar. 6, 2019), appeal docketed, No. 19-874 (2nd Cir. Apr. 5, 2019) ("[I]t is the statute of conviction, not actual conduct, that controls eligibility under the First Step Act."); see also *United States v. Laguerre*, No. 5:02-CR-30098-3, 2019 WL 861417 (W.D. Va. Feb. 22, 2019) (relying without discussion on charged drug weight rather than PSR weight to find defendant eligible for relief).

In this case, Paez pleaded guilty as to Count 1s of the Superseding Information:

Possession with Intent to Distribute (**unspecified**) Amount of Methamphetamine, however, he was held accountable to 4.4 kilograms of methamphetamine (actual) resulting to a 188-month sentence. Hence, Paez should be resentenced accordingly.

### 2. Methamphetamine Drug Purity Is Not a Proxy for Culpability

Methamphetamine, commonly known as "meth", is a highly addictive and potent stimulant drug that can have devastating effects on individuals and communities. It was made a Schedule II controlled substance in 1970. In light of the serious harm caused by methamphetamine, the criminal justice system has taken a strong stance against methamphetamine trafficking. When methamphetamine dealers are arrested they face stiff penalties designed to punish the offender and deter recidivism. In determining appropriate punishment, courts must consider a range of factors, including the weight of the controlled substance, a defendant's prior criminal history, adjustments such as the defendant's role in the drug organization, and other relevant circumstances. However, one factor – the purity of methamphetamine – has been given disproportionate emphasis in determining punishment when purity is not a proxy for culpability.

The United States Sentencing Guidelines use a two-tiered system to set the base offense level for prosecuting a methamphetamine distribution case. One tier establishes

a base offense level for high-purity methamphetamine known as "actual methamphetamine" while the other tier sets the level for "mixtures" which are substances containing a detectable amount of methamphetamine. As you might expect, defendants prosecuted for distribution of actual methamphetamine get longer sentences than defendants caught with a methamphetamine mixture. The intention of this sentencing disparity is to target the most serious offenders, but its effect is to punish all offenders with the most severe penalties without regard for an individual's actual role in the offense. This highlights the need for reform in drug sentencing laws and a more nuanced approach to addressing drug-related offenses.

Take for example, a Defendant charged with Possession with Intent to Distribute 4.5 kilograms of actual methamphetamine versus a Defendant charged with distributing the same amount of a mixture of methamphetamine. Under the Statute, crimes involving pure methamphetamine trigger a ten-year mandatory minimum penalty at 50 grams, while crimes involving a methamphetamine mixture trigger a ten-year mandatory minimum penalty at 500 grams. This is commonly referred to as the 10:1 purity ratio from the mandatory minimum penalties contained in 21 U.S.C. § 841(b)(1). With no prior criminal history, the first Defendant with actual methamphetamine has a base offense level of 38 (235 – 293 months of imprisonment) while the second Defendant with a mixture has a base offense level of 32 (121 – 151 months of imprisonment). That

is a 9 ½ year difference at the low end of the guideline range or a 94 percent increase in the sentence due solely to the purity of the methamphetamine.

The concept of drug purity plays a critical role in drug-related offenses. The reason behind increasing a defendant's sentence based on drug purity is rooted in the fact that controlled substances are often cut and diluted with other substances as they pass from wholesaler to regional distributors to street-level dealers. In devising the Guidelines, the Sentencing Commission took into account that a defendant in possession of a controlled substance of very high purity is an indication of the defendant's significant involvement in the criminal organization and proximity to the source of the drugs. "The point, then, of increasing a defendant's sentence based on drug purity is to punish defendants who have prominent roles in drug distribution." *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D.N.M. 2017). However, the assumption made by the Sentencing Commission regarding the correlation between methamphetamine purity and a defendant's criminal role is not supported by real-world evidence. In fact, this assumption potentially leads to serious miscarriages of justice. As *Ibarra-Sandoval* remarked, "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality." 265 F. Supp. 3d 1249 at 1255.

As the court in *Ibarra-Sandoval* discussed, "The average purity of

methamphetamine today is over 90 percent. This means that the sentencing Guidelines would treat the average individual convicted of a crime involving methamphetamine as a kingpin or leader, even though that simply is not true." Id. at 1255–56. In *United States v. Bean*, 371 F. Supp. 3d 46, 52–53 (D.N.H. 2019) the court stated, "In the current market, the purity of methamphetamine does not necessarily reflect a defendant's role in the distribution chain. Low-level street dealers are just as likely as so-called 'kingpins' to have access to, and be charged with distribution of, extremely pure methamphetamine. In effect, then, the purity-based methamphetamine guidelines are treating all defendants as kingpins, even though that is not necessarily true."

Trends have shown that the price per pure gram of methamphetamine has steadily decreased while the purity has increased. From 2011 to 2016, the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and for the third quarter of 2016, averaged 93.5 percent pure. See, *United States v. Nawanna*, 321 F.Supp.3d 943, 951 (N.D. Iowa 2018). "Today, most methamphetamine seized at all distribution levels is remarkably pure, which means that higher purity is not a good indicator of a defendant's place in the chain of distribution." *United States v. Siddoway*, 2023 WL 2246705, at *3 (D.Idaho, 2023). Today, a low-level street dealer would be distributing methamphetamine that would be similar in purity to the methamphetamine that came

from the top of the supply chain.

The *Nawanna* court found that "because today's methamphetamine is substantially pure, purity is not a proxy for relative culpability." 321 F.Supp.3d at 951. The *Nawanna* court noted "that there was once some truth to the Commission's assumption that large quantities are associated with high purities, because methamphetamine was cut as it worked its way down to the street-level dealer or user, but that is no longer the case." *Id.* The *Nawanna* court concluded that "because of the generally very high purity of methamphetamine available today at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases, not enhanced punishment based on individualized determinations, making the Guidelines purity enhancement excessive." *Id.* at 954.

The current Guidelines for methamphetamine have proven to be ineffective in achieving its intended goal of targeting high-level drug distributors. Instead, they recommend harsher penalties for all individuals involved in the distribution of methamphetamine, regardless of their level of involvement. The Guideline's reliance on drug purity as a factor for determining an individual's role within the organization is outdated and irrelevant in today's drug landscape. As a result, the Guidelines recommend more severe punishments for all offenders based on the drug's purity

24

without taking into account each participant's role in the offense.

The Federal Statute, 21 U.S.C. § 841(b)(1), should be amended to abolish arbitrary minimum sentences ascribed to actual methamphetamine. Minimum statutory sentences restrict a court's ability to fashion a sentence that takes into account a defendant's unique relevant circumstances and role in the offense. Furthermore, the United States Sentencing Guidelines should be updated to reflect that purity is no longer a proxy for culpability. The Guideline for methamphetamine mixtures should be applied regardless of the purity of the methamphetamine possessed.

### 3. Refusal to Follow the Actual (and Ice) Methamphetamine Guideline Based on Policy Disagreement

Two judges in the Northern District of Iowa recently have announced that they disagree with on policy grounds, and no longer will follow, the marijuana equivalency called for in the Sentencing Guidelines when imposing sentences in cases involving actual methamphetamine and ice.

The Sentencing Guidelines distinguish between a methamphetamine mixture and actual/pure methamphetamine or ice, which it defines as methamphetamine that is at least 80% pure, treating actual/pure methamphetamine or ice ten times more harshly than a mixture of marijuana. One gram of actual (pure) methamphetamine or ice has a marijuana equivalency of 20 kilograms whereas one gram of a methamphetamine

mixture has an equivalency of 2 kilograms. The ratio has its roots in 21 U.S.C. 841(b)(1). Comment 27(c) to U.S.S.G. § 2D1.1 offers the only explanation of the Commission's view on the relevance of purity to the appropriate sentence, asserting that purity "is probative of the defendant's role or position in the chain of distribution" and that "since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."

As Chief Judge Leonard T. Strand and District Judge Mark W. Bennett explain in *United States v. Harry*, 313 F. Supp. 3d 969 (N.D. Iowa 2018) and *United States v. Nawanna*, 321 F. Supp. 3d 943 (N.D. Iowa 2018), respectively, there is no empirical basis for the 10-1 ratio and, because nearly all methamphetamine trafficked is substantially pure, purity is not an accurate proxy for culpability and it makes little sense to enhance virtually all methamphetamine defendants' sentences on the basis of purity. Both judges indicated that they therefore will apply the only the 2 kilogram marijuana equivalency even in cases involving actual/pure methamphetamine or ice.

As with the crack/powder cocaine disparity, District Courts have the discretion to disagree with the Guidelines on policy grounds and find that a particular Guideline should not applied in a given case. In this case involving actual/pure methamphetamine

26

or ice, Paez argues that there is no empirical basis for applying the 10-1 ratio and that,

because purity is not actually a proxy for culpability, thus, the court should not apply.

      4.      <u>Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct</u>

With respect to the need to avoid unwarranted sentencing disparities, Paez urges

the Court to consider the *Redd* cases:

- *United States v. Clark*, Case No. 11-CR-30-2-JPS (E.D. Wis. Jul. 23, 2020) quoting that in *Redd*, the Court evaluated whether extraordinary and compelling reasons existed to reduce the sentence by considering (1) the sentence the defendant originally received compared to the one he would receive today; (2) the disparity between those sentences; and (3) the reason for that disparity. *Redd*, 2020 WL 1248493, at *5. There, the court determined that the disparity was "primarily the result of Congress' conclusion that sentences like [defendant's] are unfair and unnecessary." *Id.* at *6.

- *United States v. Brooks*, Case No. 07-cr-20047-JES-DGB (C.D. Ill. May. 15, 2020) quoting that in *Redd*, the district court held "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) and that the reasons it has determined in this case constitute extraordinary and compelling reasons warranting a sentence reduction satisfy any requirement for consistency with any applicable policy statement."

- *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020) (considering § 924(c) stacking changes one of several extraordinary and compelling reasons); *United States v. Urkevich*, No. 8:03CR37, 2019 WL

6037391, at *4 (D. Neb. Nov. 14, 2019) ("A reduction in his sentence is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed.").

Paez is now, in effect, to be re-sentenced today, after the passage of the First Step Act; and the need to avoid unwarranted sentencing disparities is to be assessed at the time of his sentencing today relative to those comparable offenders who have been sentenced following the passage of the First Step Act based on the need to avoid unwarranted sentencing disparities, which expressly allowed for the possibility for a sentence reduction based on an individualized assessment of the § 3553(a) factors and other criteria.

Paez essentially argues that the unwarranted sentencing disparity factor must be determined only with reference to those comparably situated defendant who was sentenced after Paez's sentencing and those being sentenced today under a different sentencing structure. Paez's sentence in 2017 is now disparate relative to Defendants who were sentenced after December 21, 2018.

See e.g., *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1ˢᵗ Cir. 2006) (recognizing that "a district court may consider disparities among co-defendants in determining a sentence"); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) ("Although § 3553(a) does not require district courts to consider sentencing disparity

among co-defendants, it also does not prohibit them from doing so."); *United States v. Gomez*, 215 F. App'x 200, 202 (4th Cir. 2007) (implying that consideration of co-defendant disparities is allowed, but concluding that Gomez was not similarly situated to the co-defendant); *United States v. Bennett*, 664 F.3d 997, 1015 (5th Cir. 2011) ("[A]voiding unwarranted sentencing disparities among co-defendants is a valid sentencing consideration."), cert. denied, 11-9109, 2012 WL 733887 (Apr. 2, 2012); *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) ("A district judge, however, may exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence."); *United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) ("Pulley properly contends that § 3553(a)(6) does not allow unwarranted sentencing disparities between co-defendants." (citing *Statham*, 581 F.3d at 556; *Bartlett*, 567 F.3d at 908–09)); *United States v. Lazenby*, 439 F.3d 928, 933 (8th Cir. 2006) (invalidating a sentence that resulted in unwarranted disparities between the sentences of the defendant and less culpable members of related conspiracies); *United States v. Saeteurn*, 504 F.3d 1175, 1181–83 (9th Cir. 2007) (upholding as a legitimate generalized § 3553(a) consideration the district court's decision to compare defendant with his co-defendants and sentence him in accordance with his role); *United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008) ("[A] district court may also properly account for unwarranted disparities between codefendants who are similarly situated,

to educational and behavioral change.

lection, completing faith-based Bible

in Christ III" and "Country Called

These courses, along with his active

es, show that Paez has developed the

live responsibly.

ned a spotless disciplinary record. His

it by infractions, but by steady work,

oven himself to be a responsible and

tively to society once released.

Circuit, have long recognized that

xtraordinary and compelling reason for

5, 491 (2011), the Supreme Court held

highly relevant to several § 3553(a)

insight into a defendant's character and

s v. *Jean*, 64 F.4th 855 (5th Cir. 2023),

nsider both non-retroactive changes in

ating compassionate release.

lants when deciding a sentence."); *United*

1th Cir. 2008) ("It is not erroneous for the

unwarranted sentence disparities among

een found guilty of similar conduct' when

sideration."); *United States v. Mejia*, 597

idering and rejecting an argument that a

was unwarranted), cert. denied, 131 S. Ct.

habilitation

a hardened criminal or a repeat offender.

de a serious mistake, but who immediately

enforcement. When approached by DEA

formed the officer that he had a firearm in

hout hesitation, he admitted that the gun

lness at the time of arrest reflected not

ccountability, and cooperation—traits that

elessly to transform his life. His journey

a consistent commitment to education,

Other courts echo this principle. The Fourth Circuit in *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), and the Southern District of New York in *United States v. Millan*, 2020 WL 1674058, recognized that extraordinary rehabilitation can justify early release when the defendant has truly transformed. As the Eastern District of Pennsylvania observed in *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405 (E.D. Pa. 2020), "A lengthy sentence, combined with genuine rehabilitation, may itself demonstrate that continued incarceration no longer serves the interests of justice."

Paez exemplifies the purpose behind these rulings. His rehabilitation is not superficial—it is sustained, documented, and complete. He entered prison as a first-time offender who made a mistake; he now stands as an educated, productive, and reformed man. After more than eight years in custody, he has met every rehabilitative goal the system could offer. The § 3553(a) factors—particularly the need for deterrence, public safety, and respect for the law—no longer justify his continued incarceration. Instead, they now favor his release, as he poses no threat to the community and has demonstrated both responsibility and readiness for a lawful life.

Paez's transformation is exactly what Congress envisioned when it enacted the First Step Act—to reward genuine rehabilitation and allow deserving individuals a second chance. The man who stands before this Court today is not the same man who was arrested in 2017. He has educated himself, reflected on his mistakes, and proven

33

through conduct and consistency that he is ready to return to his family and community as a reformed individual.

In sum, Paez's rehabilitation is nothing short of remarkable. His cooperation during arrest, his spotless record in custody, his educational and vocational achievements, and his moral growth all demonstrate a profound transformation. Under the reasoning of *Pepper*, *Jean*, and *McCoy*, these factors constitute "extraordinary and compelling reasons" justifying compassionate release. Continued incarceration would no longer serve justice—it would only delay the reintegration of a man who has already earned his redemption.

Under 18 U.S.C. § 3582(c)(2), to modify Paez's sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of 120–150 months, aligning with current sentencing norms for similar first-time methamphetamine/firearm cases, is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Accordingly, this motion should be granted.

## IV. CONCLUSION

For the foregoing reason, Paez prays this Court would consider his Motion for

Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of

2018, based upon the "extraordinary and compelling reasons" and reduce his sentence.

Also, Paez respectfully requests this Court to consider his BOP record and his

circumstances and join in recommending his release.

Respectfully submitted,

Dated: October ___, 2025.

BENIGNO PAEZ
REG. NO. 55694-177
FCI BASTROP
FEDERAL CORR. INSTITUTION
P.O. BOX 1010
BASTROP, TX 78602
Appearing *Pro Se*

35

## CERTIFICATE OF SERVICE

I hereby certify that on October ___, 2025, I mailed a true and correct copy of the above and foregoing Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018 via U.S. Mail, postage prepaid, to Joshua Jerome Frausto - D.O.J., U.S. Attorney's Office, 500 South Taylor Street, Amarillo, TX 79101.

12-17-25

BENIGNO PAEZ

36

**<u>EXHIBIT 1:</u>**
**"Certifications of Achievements"**
**"Inmate Data"**










FCI – Bastrop Recreation Department

## Certificate for the Completion of

# Pencil Art

Presented to

## Benigno Paez

# 55694-177

## In Recognition of Successfully Completing

## All Program Requirements

B. Roschetzky

B. McCravey, Sports Specialist – FCI Bastrop

3/23/2023

Date

Federal Correctional Institution • Bastrop • Texas • Recreation Department



# Source of Light Kansas

*Discipleship Training Branch of SLMI*

PO Box 149 -- Newton, KS 67114



## Bible Correspondence Course Certificate

### *Benigno Paez*

having satisfactorily completed

### *The New Life in Christ III*

is granted this Certificate by Source of Light Ministries International in recognition of this achievement on this

February 15, 2022

| *Ron Barnes* | *Ray Walker* | *H. Leon Scott* |
|---|---|---|
| General Director | International Schools Director | Representative |
| SLM International | SLM International | |

*"The things that thou has heard of me among many witnesses, the same commit thou to faithful men, who shall be able to teach others also."*

2 Timothy 2:2



## Record of Grades for Bible Correspondence Course
## The New Life in Christ III

| Lesson 1 | A+ | Lesson 16 | A+ |
|---|---|---|---|
| Lesson 2 | A+ | Lesson 17 | A+ |
| Lesson 3 | A+ | Lesson 18 | A+ |
| Lesson 4 | A+ | Lesson 19 | A+ |
| Lesson 5 | A+ | Lesson 20 | A+ |
| Lesson 6 | A+ | Lesson 21 | A+ |
| Lesson 7 | A+ | Lesson 22 | A+ |
| Lesson 8 | A+ | Lesson 23 | A+ |
| Lesson 9 | A+ | Lesson 24 | A |
| Lesson 10 | A+ | Lesson 25 | A+ |
| Lesson 11 | A+ | | |
| Lesson 12 | A+ | | |
| Lesson 13 | A+ | | |
| Lesson 14 | A+ | | |
| Lesson 15 | A+ | | |



# Source of Light Kansas

*Discipleship Training Branch of SLMI*

PO Box 149 -- Newton, KS 67114



# Bible Correspondence Course Certificate

## Benigno Paez

having satisfactorily completed

### Country Called Heaven

is granted this Certificate by Source of Light Ministries International in recognitin of
this achievement on this

August 20, 2021

| Ron Barnes | Ray Walker | H. Lon Scott |
|---|---|---|
| General Director | International Schools Director | Rejsentative |
| SLM International | SLM International | |

*"The things that thou hast heard of me among many witnesses, the same commit thou faithful men,
who shall be able to teach others also."*

2 Timothy 2:2

## Record of Grades for Bible Correspondence Course
## Country Called Heaven

| Lesson 1 | A+ | | Lesson 16 | A+ |
|---|---|---|---|---|
| Lesson 2 | A+ | | Lesson 17 | A+ |
| Lesson 3 | A+ | | Lesson 18 | A+ |
| Lesson 4 | A+ | | | |
| Lesson 5 | A+ | | | |
| Lesson 6 | A+ | | | |
| Lesson 7 | A+ | | | |
| Lesson 8 | A- | | | |
| Lesson 9 | A+ | | | |
| Lesson 10 | A+ | | | |
| Lesson 11 | A- | | | |
| Lesson 12 | A+ | | | |
| Lesson 13 | A+ | | | |
| Lesson 14 | A+ | | | |
| Lesson 15 | A+ | | | |

# Certificate

Presented to

## BENIGNO PAEZ

*For your faithful participation and completion in*



November 25, 2019

I. Stafford, Chaplain

Upon the recommendation of the Institution

*UNICOR Recognizes that*

# Benigno Paez

*Has completed the requisite program of studies in the course*

*Automotive Electronic Technician*

*And hereby awards this certificate of completion.*

*Given at Bastrop, Texas, this 29ᵗʰ day of November, Two Thousand Nineteen.*

*With all honors, rights, privileges, and responsibilities thereunto appertaining.*



Thor Russell
Training Course Foreman

Michael Paxton
Factory Manager

FPI Bastrop Faculty
Michael Paxton
Factory Manager
Thor Russell
Training Course Foreman
Shawn Mikeska
Supervisor of Education
Brian Brouillette
Senior Operations Manager

# UNICOR

## Federal Prison Industries of UNICOR

*Upon the recommendation of the Institution*

*UNICOR Recognizes that*

## Benigno Paez

*Has completed the requisite program of studies in the course*

### Electronic Soldering Technique

*And hereby awards this certificate of completion.*

*Given at Bastrop, Texas, this 1ˢᵗ day of November, Two Thousand Nineteen.*

*With all honors, rights, privileges, and responsibilities thereunto appertaining.*





T. Russell
Training Course Foreman

Michael Paxton
Factory Manager

FPI Bastrop Faculty
**Michael Paxton**
Factory Manager
**Thor Russell**
Training Course Foreman
**Shawn Mikeska**
Supervisor of Education
**Brian Brouillette**
Senior Operations Manager

*Federal Correctional Complex*
Victorville, CA



# Certificate of Completion

*presented to*

*Benigno-Paez*

*who has successfully completed the 10 hour self-study course at*
*FCC Victorville*

**Criminal Lifestyles**

*May 24, 2018*

D. L. DePierre, Staff Psychologist

# Certificate of Achievement

presented to

## Benigno Paez

who has completed the 6-week inmate-led course

### DOING TIME WORKSHOP:
LEARNING EFFECTIVE STRATEGIES WHILE ENHANCING
ABILITIES TO ADJUST TO AN INSTITUTIONAL ENVIRONMENT

on May 25, 2018

_Mark Murray, Inmate Facilitator_

**Federal Correctional Complex**
*Victorville, CA*

# Certificate of Completion

*presented to*

## Benigno Paez

Successfully completed the following 2.5 hour seminar at
FCC Victorville:

### Criminal Thinking: Therapeutic Journaling

*March 9, 2018*



Dr. L. DePierre, Staff Psychologist

# FIRST STEP ACT 2018
## Certificate of Completion
is hereby granted to

# Benigno Paez

to certify that they completed to satisfaction

## MONEY SMART 2018

Granted: 32 Hour Program



Signed by:    S. BARFIELD, TEACHER



# CERTIFICATE OF COMPLETION

Federal Correctional Complex Victorville

## FCI-II EDUCATION DEPARTMENT

certifies that

## Benigno Paez

Has satisfactorily completed 10 participation hours in

## JOB FAIR

September 28, 2018

F. Ansari, Program Coordinator

# CERTIFICATE OF COMPLETION

### FCC VICTORVILLE EDUCATION DEPARTMENT

This certifies that

**Bonigno Paez**

Has satisfactorily completed 10 participation hours on this 10th day of September, 2018 in

**Lifeskills**

T. Roberison, Adult-Continuing Education Coordinator




*Federal Correctional Complex*

*Victorville, CA*



# Certificate of Completion

*presented to*

## Benigni Paez

*who has successfully completed the 10 hour self-study course at*

*FCC Victorville*

### Substance Using Behavior

*December 13, 2018*



Staff Psychologist, Dr. Pagano

# CERTIFICATE OF COMPLETION

Federal Correctional Complex Victorville

## FCI-II EDUCATION DEPARTMENT

certifies that

# Benigno Paez

Has satisfactorily completed 10 participation hours in

## Resume Writing

September 28, 2018



F. Ansari, Program Coordinator

# Certificate of Completion

*Presented to*

## Benigno Paez

*For an outstanding participation and completion of 10 hours in*

**ACE: Advance Construction Level 1**

*Given at FCI-2 Education Department in Victorville on 12-10-2018.*



*Prof. B. Rodriguez*
*Education Specialist*



# CERTIFICATE OF COMPLETION

This is to certify that

*Benigno Paez*

has successfully completed



# INSPIRE Parenting

Presented on the 13th day of November 2018
at Victorville Federal Correction Complex



_Assistant Supervisor of Education_

Ms. Teage
_Facilitator_



# Office of the State Superintendent of Education

This Certifies That

## BENIGNO PAEZ

having satisfactorily completed the Tests of General Educational Development
with scores comparable to those of high school graduates,
is hereby awarded this

## High School Equivalency Credential

and is entitled to all the Rights and Privileges appertaining thereto.

In witness whereof my name are hereto affixed, this the
1st Day of February, 2019

Hanseul Kang
State Superintendent of Education

Antoinette S. Mitchell, Ph.D.
Assistant Superintendent
Postsecondary and Career Education

Philip L. PremDas
GED Administrator



★ ★ ★ GOVERNMENT OF THE DISTRICT OF COLUMBIA
MURIEL BOWSER, MAYOR

District of Columbia
Office of the State
Superintendent of Education
OSSE

# CERTIFICATE OF COMPLETION

*FCC VICTORVILLE, USP EDUCATION DEPARTMENT*

This certifies that

## Benigno Paez

Has satisfactorily completed 10 participation hours
On this 19th day of March 2019 in

## Going Out by Going In (GOGI)

*G. Chavez*

G. Chavez, Teacher

Federal Correctional Complex
Victorville, CA

# Certificate of Completion

presented to

*Benigno Paez*

who has successfully completed the 20 hour self-study course at
FCC Victorville

**Basic Cognitive Skills**
Breaking The Cycle

May 3, 2018

_____
Dr. Irvin, Staff Psychologist








FCI – Bastrop Recreation Department

Certificate for the Completion of

# Beginners Oil Painting  Class

Presented to

## Benigno Paez

# 55694-177

In Recognition of Successfully Completing

All Program Requirements

J. Roschetzky
Recreation Specialist – FCI Bastrop

6/16/2023
Date

**Federal Correctional Institution • Bastrop • Texas • Recreation Department**

**Federal Correctional Complex**
*Victorville, CA*



# Certificate of Completion

*presented to*

## Benigno Paez

*who has successfully completed the 20 hour self-study course at*
*FCC Victorville*

### Anger Management
*December 13, 2018*

Staff Psychologist, Dr. Pagano

# Certificate of Completion

Presented to

## Benigno Paez

who has successfully completed the

**Bureau Rehabilitation and Values Enhancement
(BRAVE) Program
at FCI-2 Victorville, CA**

on October 1, 2018



_____
G. Garcia, BRAVE Treatment Specialist

# CERTIFICATE OF COMPLETION

THIS CERTIFICATE IS PRESENTED TO

## PAEZ, BENIGNO

FOR SUCCESSFUL COMPLETION OF

## BUDGETING BASICS

DATED THIS 27TH DAY OF DECEMBER 2022

# CERTIFICATE OF COMPLETION

THIS CERTIFICATE IS PRESENTED TO

## PAEZ, BENIGNO

FOR SUCCESSFUL COMPLETION OF

## ELECTRICAL I

DATED THIS 11TH DAY OF JUNE 2024

# The United States Department of Labor

## Office of Apprenticeship

### Certificate of Completion of Apprenticeship

*This is to certify that*

**Benigno Paez**

*has completed an apprenticeship for the occupation*

**WELDER, COMBINATION**

*under the sponsorship of*

**Federal Bureau of Prisons (BOP)**

*In Participation With*   **BASTROP FCI**

*in accordance with the basic standards of apprenticeship established by the Secretary of Labor*



_Megan N. Bird_
*Acting Administrator, Office of Apprenticeship*

*Date Completed* October 28, 2025

*Digital ID*   4784042

# CERTIFICATE OF COMPLETION

THIS CERTIFICATE IS PRESENTED TO

PAEZ, BENIGNO

FOR SUCCESSFUL COMPLETION OF

SOCIAL SKILLS

DATED THIS 4TH DAY OF APRIL 2023

# CERTIFICATE OF COMPLETION

THIS CERTIFICATE IS PRESENTED TO

PAEZ, BENIGNO

FOR SUCCESSFUL COMPLETION OF

THINKING SKILLS

DATED THIS 22ND DAY OF NOVEMBER 2022

```
  BAS53                    *        PUBLIC INFORMATION        *      09-06-2025
  PAGE 002                 *          INMATE DATA             *      20:05:31
                                   AS OF 09-06-2025

REGNO..: 55694-177  NAME: PAEZ, BENIGNO

                    RESP OF: BAS
                       PHONE..: 512-921-3903    FAX: 512-304-011
FSA ELIGIBILITY STATUS IS: INELIGIBLE

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.

HOME DETENTION ELIGIBILITY DATE....: 06-16-2035

THE INMATE IS PROJECTED FOR RELEASE: 12-16-2035 VIA GCT REL

----------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------

COURT OF JURISDICTION...........: TEXAS, NORTHERN DISTRICT
DOCKET NUMBER...................: 2:17-CR-00043-D-BR(2
JUDGE...........................: FITZWATER
DATE SENTENCED/PROBATION IMPOSED: 11-29-2017
DATE COMMITTED..................: 01-09-2018
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO

                     FELONY ASSESS  MISDMNR ASSESS   FINES        COSTS
NON-COMMITTED.: $200.00           $00.00          $00.00        $00.00

RESTITUTION...:   PROPERTY: NO  SERVICES: NO        AMOUNT: $00.00

-------------------------CURRENT OBLIGATION NO: 010 --------------------------
OFFENSE CODE......: 383     21:841 SCH II NON-NARCOTIC

OFF/CHG: 21:841(A)(1)&(B)(1)(C)-POSSESSION WITH INTENT TO DISTRIBUTE
         METHAMPHETAMINE

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:    188 MONTHS
 TERM OF SUPERVISION............:      3 YEARS
 DATE OF OFFENSE................: 04-30-2017

G0002      MORE PAGES TO FOLLOW . . .
```

```
BASD3              *      PUBLIC INFORMATION        *      09-06-2025
PAGE 003           *          INMATE DATA           *      20:15:31
                            AS OF 09-06-2025

PFCNO..: 55694-177 NAME.: PAEZ, BENIGNO

                      RESP OF: BAS
                      PHONE..: 512-321-3903    FAX: 512-304-0117
------------------------CURRENT OBLIGATION NO: 020 ------------------------
OFFENSE CODE....:  330      18:924(C) FIREARMS LAWS

OFF/CHG: 18:924(C)(1)(A)-POSSESSION OF A FIREARM IN FURTHERANCE OF A
              DRUG TRAFFICKING CRIME

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   60 MONTHS
 TERM OF SUPERVISION............:    3 YEARS
 DATE OF OFFENSE................: 04-30-2017

------------------------CURRENT COMPUTATION NO: 010 ------------------------

COMPUTATION 010 WAS LAST UPDATED ON 05-16-2025 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 12-26-2018 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010, 010 020

 DATE COMPUTATION BEGAN.........: 01-29-2018
 AGGREGATED SENTENCE PROCEDURE..: AGGREGATE GROUP 800 PLRA
 TOTAL TERM IN EFFECT...........:  248 MONTHS
   TOTAL TERM IN EFFECT CONVERTED..:  20 YEARS      8 MONTHS
 AGGREGATED TERM OF SUPERVISION..:    3 YEARS
 EARLIEST DATE OF OFFENSE.......: 04-30-2017

 JAIL CREDIT....................:    FROM DATE     THRU DATE
                                     04-30-2017    05-04-2017



G0002      MORE PAGES TO FOLLOW . . .
```

```
  RADI3            *      PUBLIC INFORMATION        *     09-06-2025
PAGE 001 OF 004 *              INMATE DATA           *     20:05:31
                            AS OF 09-06-2025

REGNO...: 56694-177 NAME: PARK, BENIGNO

                    RESP OF: BAS
                          PHONE..: 512-321-3903    FAX: 512-301-011
TOTAL TW OR CREDIT TIME........: 5
TOTAL INOPERATIVE TIME.........: 0
TOTAL GCT EARNED AND PROJECTED.: 992
TOTAL GCT EARNED...............: 296
STATUTORY RELEASE DATE PROJECTED: 10-16-2025
FEDERAL OFFENDER TWO THIRDS DATE: 10-15-2023
EXPIRATION FULL TERM DATE.......: 09-03-2036
TIME SERVED....................:       YEARS     8 MONTHS       5 DAYS
PERCENTAGE OF FULL TERM SERVED..: 3%.
PERCENT OF STATUTORY TERM SERVED: 4%.

PROJECTED SATISFACTION DATE.....: 10-16-2035
PROJECTED SATISFACTION METHOD...: GCT REL

GC055       NO PRIOR SENTENCE DATA EXISTS FOR THIS INMATE
```



U.S. POSTAGE PAID
FCM LG ENV
BASTROP, TX 78802
DEC 19, 2025
$0.00
S2324M505084-50

79101

Retail

RDC 99

Benigno Tecoasseta
Federal Correction Is
Bastrop
Po Box 1010
Bastrop Texas

Ms. Karen Mitchell
Clerk Of Court
U.S. District Court
Northern District Of Texas
Amarillo Division
205 SE AVENUE  ROOM 133
Amarillo, TX 79101